**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Adeshina O. Oshilaja; Rebecca S. Indermaur, )<br>)<br>      Plaintiffs, )<br>)<br>vs. )<br>)<br>)<br>Ms. Yvonne Watterson; Gateway )<br>Community High School; Gateway)<br>Community College; Maricopa )<br>County Community College )<br>District, )<br>)<br>      Defendants. )<br>)<br>_____ ) | No. CV 05-3429-PHX-RCB<br><br>**O R D E R** |

  Currently pending before the court is a motion for summary
judgment brought pursuant to Fed. R. Civ. P. 56 by defendants,
Yvonne Watterson, Gateway Community High School, Gateway
Community College, and Maricopa County Community College District
(doc. 21); and a cross-motion for summary judgment by plaintiffs,
Adeshina O. Oshilaja and Rebecca S. Indermaur (docs. 24 & 25).[1]

---

[1]  Finding these motions suitable for resolution without oral argument, the court denies the parties' request in this regard.

1   Having reviewed the parties' extensive submissions, including
2   over 500 pages of deposition testimony, and supporting affidavits
3   (doc. 22, 23, and 26-29), the court rules as follows.

4                        ***Background*[2]**

5     Plaintiffs, Adeshina Oshilaja and Rebecca Indermaur, were
6   employed by the defendant Maricopa County Community College
7   District where they worked as math/science teachers at Gateway
8   Community High School ("the High School"), another defendant.
9   The High School is a charter school operating on the campus of
10  defendant Gateway Community College in Phoenix, Arizona.  The
11  High School principal and plaintiffs' immediate supervisor,
12  Yvonne Watterson, also is named as a defendant herein.

13    Plaintiff Oshilaja was hired, on a one year contract, as a math
14  and science teacher on July 29, 1995.  Doc. 22 (Def. SOF), exh. 1
15  thereto (Dep'n of Adeshina Oshilaja (7/21/06)) at 49-50.
16  Thereafter, until May 2004, he continued to be employed on an
17  annual basis.  As he agreed during his deposition, from 1995
18  until the spring of 2004, roughly two or three months before the
19  annual contracts were to end, another contract would be placed in
20  his school mailbox.  Id. If Mr. Oshilaja decided to continue
21  teaching at the High School, he would sign the contract for the
22  next academic year.  Id.  Plaintiff Indermaur described the
23  annual contract process similarly, agreeing "in essence" that she
24  was "working at the school on a year by year contract."  Id.,

25

26       [2]      These facts are taken from the pleadings and from plaintiffs'
27  depositions which "for purposes of this motion only," defendants "agree" are
    "true and accurate."  Mot. (doc. 21) at 4.

28                             - 2 -

1  exh. 2 thereto (Dep'n of Rebecca Indermaur (8/11/06)) at 39.

2    The High School's population consisted of "at risk" students.

3  Id., exh. 2 thereto at 33.  Some of the students were

4  "dropout[s]" from other, more traditional high school settings,

5  for example.  Id., exh. 1 thereto at 31.  Prior to Ms. Watterson

6  becoming principal, the High School had a number of problems,

7  such as low attendance rates and declining enrollment.  Id., exh.

8  2 thereto at  34-35.  When Ms. Watterson became principal, the

9  model for the High School changed.  Among other things, the

10 School became "more structured."  Id. at 33.  Part of that change

11 was that the School adopted an "early college" model where

12 students could take college as well as high school classes, thus

13 allowing more students to attend college.  Id. at 30 and 41.

14   Transition to this early college model was to occur during the

15 2004-2005 academic year.  Id. at 41.  Prior to that, at a January

16 16, 2004, faculty meeting, defendant Watterson announced that all

17 teachers needed to reapply for their positions for the next

18 academic year (2004-2005).  Id., exh. 1 thereto at 192-93.  When

19 asked about this announcement, plaintiff Oshilaja emphatically

20 replied that "one thing we all remember" is that we were told

21 that "[a]ll teachers need[] to reapply for their job."  Id. at

22 193 (emphasis added).  He reiterated, "We all need to reapply for

23 our job."  Id. (emphasis added).  When asked if he remembered the

24 exact words, plaintiff Oshilaja again stated, "We all need to

25 reapply for our job, all of the staff, all the teaching staff."

26 Id. (emphasis added).

27   The explanation for requiring all teachers to reapply was, as

28                                  - 3 -

1  plaintiff Oshilaja understood it, because of "[d]uty change[.]"

2  Id.  To him that meant that instead of teaching a combined

3  math/science class, those subjects would be taught separately.

4  See id.  Plaintiff Oshilaja further testified that that

5  explanation "ma[d]e sense[]" to him.  Id.  Although there may

6  have been more said during this meeting, Mr. Oshilaja repeated

7  that  the "one important thing . . . [he] remember[ed]" was "a

8  statement being made that *all the teaching staff was going to*

9  *have to reapply* for their jobs[.]" Id. at 195 (emphasis added).

10   During her deposition plaintiff Indermaur was also questioned

11  about this January 16, 2004 faculty meeting.  She "remember[s]

12  Ms. Watterson telling [her] and all the faculty who attended that

13  . . . . meeting that because of the transformation that the

14  school was going to go through in adopting this early college

15  high school model, . . . job descriptions. . . were being changed

16  and she encouraged all of [them] to reapply[.]"  Id., exh. 2

17  thereto at 244.  As plaintiff Indermaur readily admitted,

18  however, she chose not to reapply.  Id.  Plaintiff Indermaur

19  further agreed that she was "never" advised in writing or

20  otherwise that she was "terminated" from job at the high school.

21  Id. at 249; and at 66-67  In fact, when asked if she was "ever

22  actually fired or terminated[,]" Ms. Indermaur replied, "No[;]

23  [m]y contract came to an end[]" in May 2004. Id. at 66.

24   Unlike plaintiff Indermaur, Mr. Oshilaja decided to reapply for

25  his teaching position.  He filled out the job application and was

26  interviewed by the screening committee – an interview which

27  lasted 45 minutes to an hour.  Id., exh. 1 thereto at 197 and

28

198.    Defendant Watterson was one of the five members on that committee.   _Id._ Others were also interviewed, but Mr. Oshilaja was not present as those interviews were conducted separately. _Id._ at 198.   Based upon his own estimation from the District's disclosures, Mr. Oshilaja testified that he was "the second to the lowest" of "maybe[] five applicants[.]" _Id._ at 227. Subsequently Mr. Oshilaja received a letter advising him that the screening committee had decided to hire someone else.   _Id._ at 199.

   When specifically asked who was hired instead of him, plaintiff could not identify anyone.   Instead, he responded, "[p]robably not black and not old as I am."   _Id._ at 226.   Following up, plaintiff was asked if that response was "base[d] on any personal knowledge, or [was] [it] simply based on a suspicion[.]" _Id._ He answered that from his "personal knowledge[,]" the people that were interviewed for "his position" were "not black" and were "younger" than him.   _Id._   Plaintiff Oshilaja did not elaborate as to the source of his knowledge; nor did he provide any further details, such as the ages of the persons interviewed or their qualifications.   When he was not rehired, his last day of employment at the High School was May 14, 2004.   _Id._ at 18.   Like plaintiff Indermaur, Mr. Oshilaja was never advised in writing or otherwise that he was terminated.   _Id._ at 56-57; and 225.   His 2003-2004 contracted ended, by its own terms; and he was not rehired.

   Shortly thereafter, in June 2004, plaintiffs each filed a "Charge of Discrimination" with the Equal Employment Opportunity

1   Commission ("EEOC") and with the Arizona Attorney General's Civil

2   Rights Division ("CRD").  Those Charges were based solely on

3   allegations of age discrimination in violation of the Age

4   Discrimination in Employment Act, ("ADEA"), 29 U.S. C. § 621 *et*

5   *seq.*  See Doc. 23, exh. 1, parts 5 and 7 thereto.  Following an

6   investigation, those Charges were dismissed and plaintiffs were

7   issued "Notice of Right to Sue" letters by the Arizona Attorney

8   General's CRD.  Id., exh. 1 thereto.

9      The following year, on June 22, 2005, plaintiffs filed the

10  present action in Arizona Superior court, Maricopa County.

11  Defendants timely removed to this district court on October 26,

12  2005.

13                        ***Discussion***

14  ***I.  Summary Judgment Standard***

15     Pursuant to Fed. R. Civ. P. 56©, a party is entitled to

16  summary judgment "if the pleadings, depositions, answers to

17  interrogatories, and admissions on file, together with the

18  affidavits, if any, show that there is no genuine issue as to any

19  material fact and that the moving party is entitled to a judgment

20  as a matter of law."   It is beyond dispute that "[t]he moving

21  party bears the initial burden to demonstrate the absence of any

22  genuine issue of material fact."   Horphag Research Ltd. v.

23  Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007) (citation omitted).

24  "The criteria of 'genuineness' and 'materiality' are distinct

25  requirements."   Nidds v. Schindler Elevator Corp., 113 F.3d 912,

26  916 (9th Cir. 1996) (citing Anderson v. Liberty Lobby, Inc., 477

27  U.S. 242, 248 (1986)).   "The requirement that an issue be

28                          - 6 -

'genuine' relates to the quantum of evidence the plaintiff must produce to defeat the defendant's motion for summary judgment." Id. "There must be sufficient evidence 'that a reasonable jury could return a verdict for the nonmoving party.'" Id. (quoting Anderson, 477 U.S. at 248). "As to materiality, the substantive law will identify which facts are material." Anderson, 477 U.S. at 248. Here, as will be seen, the substantive law is the ADEA. "Once the moving party meets its initial burden, . . . , the burden shifts to the nonmoving party to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." Id. (internal quotation marks and citations omitted). This "[e]vidence must be concrete and cannot rely on 'mere speculation, conjecture, or fantasy.'" Bates v. Clark County, 2006 WL 3308214, at * 2 (D.Nev. Nov. 13, 2006) (quoting O.S.C. Corp. v. Apple Computer, Inc., 792 F.2d 1464, 1467 (9th Cir. 1986)). Similarly, "a mere 'scintilla' of evidence" is not sufficient "to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" Fazio v. City & County of San Francisco, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting Anderson, 477 U.S. at 249, 252). Thus, in opposing a summary judgment motion it is not enough to "simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted).

By the same token though, when assessing the record to determine whether there is a "genuine issue for trial," the court

1   must "view the evidence in the light most favorable to the

2   nonmoving party, drawing all reasonable inferences in his favor."

3   Horphaq, 475 F.3d at 1035 (citation omitted).  "This is true even

4   though[,]" as here, "the court is presented with cross-motions

5   for summary judgment[.]" High Tech Gays v. Defense Ind. Sec.

6   Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990) (citation

7   omitted).  "Nevertheless, inferences are not drawn out of the

8   air, and it is the opposing party's obligation to produce a

9   factual predicate from which the inference may be drawn."  Yang

10  v. Peoples Benefit Ins. Co., 2007 WL 1555749, at *7 (E.D.Cal. May

11  25, 2007) (citations omitted).

12    On a summary judgment motion, the court may not make

13  credibility determinations; nor may it weigh conflicting

14  evidence. See Anderson, 477 U.S. at 255.  Thus, as framed by the

15  Supreme Court, the ultimate question on a summary judgment motion

16  is whether the evidence "presents a sufficient disagreement to

17  require submission to a jury or whether it is so one-sided that

18  one party must prevail as a matter of law."  Id. at 251-52.

19    The fact that a plaintiff is appearing pro se, as are the

20  plaintiffs herein, does not alter the applicability of these

21  general summary judgment rules.  See Semper v. JBC Legal Group,

22  2005 WL 2172377, at *1 (W.D. Wash. 2005) ("Although the rule

23  requires that the allegations of a pro se complaint be liberally

24  construed in determining whether a viable claim has been asserted

25  and that strict compliance with procedural/technical rules will

26  not be expected of pro se litigants, it does not alter the

27  summary judgment standard or otherwise give pro se non-prisoner

28

1  litigants multiple opportunities to present their evidence.").

2  The summary judgment rules apply with equal force to *pro se*

3  litigants because they "must follow the same rules of procedure

4  that govern other litigants." <u>King v. Atiyeh</u>, 814 F.2d 565, 567

5  (9th Cir. 1987); <u>see also</u> <u>Ghazali v. Moran</u>, 46 F.3d 52, 54 (9th

6  Cir. 1995) (citation omitted) ("Although we construe pleadings

7  liberally in their favor, pro se litigants are bound by the rules

8  of procedure.") In fact, in <u>Jacobsen v. Filler</u>, 790 F.2d 1362 (9th

9  Cir. 1986), the Court rejected the argument that *pro se* non-

10 prisoner litigants are entitled to notice from the court

11 regarding the requirements of Rule 56.  In so doing, the Court

12 unequivocally stated that "pro se litigants in the ordinary civil

13 case should not be treated more favorably than parties with

14 attorneys of record." <u>Id.</u> at 1364.  Accordingly, although

15 plaintiffs are appearing *pro se*, they are held to the same

16 standards as any other represented party on a motion for summary

17 judgment.

18 ***II.  Discrimination Claims***

19    Plaintiffs' complaint can be read as asserting claims under

20  the ADEA,  Title VII of the Civil Rights Act of 1964, 42 U.S.C.

21 § 2000e, *et seq.* ("Title VII"), and two pendent state law claims.

22 For now the court will focus on plaintiffs' discrimination

23 claims.

24   ***A.  Title VII***

25  Plaintiffs explicitly assert four separate claims under Title

26 VII:  (1) "hostile work environment[;]" (2) "disparate

27 treatment[;]" (3) "discriminatory seniority system[;]" and (4)

28                              - 9 -

1  "constructive discharge[.]" Co. (Doc. 6-2) at 5, ¶¶ 10-14; at 6,

2  ¶¶ 15-17 and ¶¶ 18-19; and at 7-8, ¶¶ 25-27.  In moving for

3  summary judgment, defendants assumed that the court has subject

4  matter jurisdiction over these claims; so they addressed the

5  merits.  As will be seen though, because the court lacks subject

6  matter jurisdiction to consider these Title VII claims, it will

7  not and, indeed, cannot address the merits of such claims.

8     Under Title VII it is "an unlawful employment practice for an

9  employer . . . to fail or refuse to hire or to discharge any

10 individual, or otherwise to discriminate against any individual

11 with respect to his compensation, terms, conditions, or

12 privileges of employment, because of such individual's *race,*

13 *color, religion, sex*, or *national origin*[.]" 42 U.S.C.

14 § 2000e-2(a)(1) (West 2003) (emphasis added).  As the plain

15 language of that statute indicates, an essential element of a

16 claim thereunder is a showing that the plaintiff comes within the

17 protected class.  See Pullom v. U.S. Bakery, 477 F.Supp.2d 1093,

18 1100 (D. Or. 2007) ("To establish a prima facie case of

19 discrimination . . . , a plaintiff must offer proof that[,]"

20 among other things, that "he or she belongs to a class of persons

21 protected by Title VII[.]")

22    Before a plaintiff may proceed with a Title VII action in

23 federal court, they must first exhaust their administrative

24 remedies.  This is done by "filing a timely charge with the EEOC

25 or the appropriate state agency." Howard v. Kiewit Pacific

26 Corp., 2006 WL 278603, at *3 (D. Hawai'i 2006) (citing 42 U.S.C.

27 § 2000e(f); and Freeman v. Oakland Unified School District, 291

28                              - 10 -

F.3d 632, 636 (9th Cir. 2002)).  This is a jurisdictional

prerequisite.  <u>See id.</u>  The purpose of this administrative charge

is to "giv[e] the charged party notice of the claim and narrow[]

the issues for prompt adjudication and decision."  <u>Freeman</u>, 291

F.3d at 636.  "Subject matter jurisdiction extends over all

allegations of discrimination that fell within the scope of

either the EEOC's actual investigation or an EEOC investigation

which can reasonably be expected to grow out of the charge of

discrimination."  <u>Brooks v. ATC/Vancom, Inc.</u>, 2007 WL 1063059, at

*3 (D. Nev. April 4, 2007) (citing <u>B.K.B. v. Maui Police Dept.</u>,

276 F.3d 1091, 1100 (9th Cir. 2002)).

   The Ninth Circuit has repeatedly held that EEOC charges must be

construed "with utmost liberality since they are made by those

unschooled in the technicalities of formal pleading."  <u>Lyons v.

England</u>, 307 F.3d 1092, 1104 (9th Cir. 2002) (quoting <u>Kaplan v.

Int'l Alliance of Theatrical & Stage Employees</u>, 525 F.2d 1354,

1359 (9th Cir. 1975)) (other citation omitted).  "In determining

whether the exhaustion requirement has been satisfied, the court

may consider such factors as the alleged basis of the

discrimination, dates of discriminatory acts specified within the

charge, and any locations at which discrimination is alleged to

have occurred."  <u>Howard</u>, 2006 WL 278603, at *3 (citing <u>Freeman</u>,

291 F.3d at 636).  When examining these factors, the Ninth

Circuit deems "[t]he crucial element of a charge of

discrimination" to be "the factual statement contained therein."

<u>Freeman</u>, 291 F.3d at 636 (internal quotation marks and citation

omitted).

1    The plaintiffs each timely filed a "Charge of Discrimination"

2  with the Arizona Attorney General's CRD and with the EEOC.[3]

3  Significantly, however, those Charges are confined to allegations

4  of age discrimination in violation of the ADEA.  Nowhere in

5  either Charge do plaintiffs even hint at the possibility that

6  they were discriminated against on any basis other than age.  For

7  example, in the space designated "discrimination because of[,]"

8  plaintiffs had a choice of marking the following boxes: "Race,

9  Color, Sex, Religion, National Origin (15/+), Age, Retaliation,

10 Disability, and/or Other (Specify)[.]" See Doc. 23, exh. 1

11 thereto at parts 5 and 7.  They each checked only the box marked

12 "Age[.]" Id.  Alone that might not be determinative of whether

13 plaintiffs' EEOC Charges included Title VII claims.  That fact

14 combined with the factual statements contained in their

15 respective EEOC Charges, however, clearly shows that age is the

16 sole basis for plaintiffs' discrimination claims.

17   Plaintiffs' Charges are replete with references to age, and

18 conspicuously silent as to any other type of alleged basis for

19 discrimination.  To illustrate, under the section entitled

20 "DISCRIMINATION STATEMENT[]" both plaintiffs unequivocally

21 stated:  "I believe I have been *discriminated against because of*

22 *my Age*[.]" Id. (emphasis added).  Plaintiff Indermaur then gave

23 her age as "64 years old (12/05/39)[]" and plaintiff Oshilaja

24 gave his age as "49 years old[.]" Id., exh. 1 thereto at Part 7

25 thereto at 28; and Part 5 thereto at 25.  Further, they both

26 ───────────────

27     [3]      For ease of reference, hereinafter these documents will be referred
   to as "the Charges."

28                              - 12 -

claim to have been "subjected to different terms and conditions of employment than *younger teachers under age 40*[.]" <u>Id.</u> (emphasis added). Likewise, in their "discrimination statements,[,]" both plaintiffs stated:  "In or about January 2004 *older teachers including myself* were told we had to reapply for our positions and that contracts would no longer be renewed automatically for the next contract year."  <u>Id.</u> (emphasis added).

 Plaintiffs concluded those statements by indicating that they "believe[d] and therefore allege, that *but for my age*, I would not have been subjected to unequal terms and conditions of employment[.]" <u>Id.</u> (emphasis added).  In the case of plaintiff Indermaur, she further stated that "but for [her] age" she "would not have been forced to constructively terminate [her] employment."  <u>Id.</u>, exh. 1 thereto, Part 7 at 28.  In a similar vein, plaintiff Oshilaja stated that "but for [his] age" he "would not have been terminated through failure to renew [his] contract and rehire [him]." <u>Id.</u>, exh. 1 thereto, Part 5 at 25.

 As is abundantly clear by now, neither EEOC Charge mentions or even alludes to the fact that plaintiffs may be members of a protected class for purposes of establishing liability under Title VII.  There is, for example, no mention of plaintiffs' race, color or national origin.  Consequently, "[n]othing in th[ose] EEOC charge[s] would have indicated to investigators that the investigation should address race, color, or any type of discrimination other than age . . . discrimination." <u>Howard</u>, 2006 WL 278603, at *4 (citing <u>Freeman</u>, 291 F.3d at 637 ("where allegations in EEOC charge refer to discrimination in relation to

1  a specific election, allegations of discrimination in other

2  contexts, such as class size or teaching assignments, would not

3  have been necessary to, or addressed in, the scope of the EEOC

4  investigation")) (internal quotation marks omitted).  Moreover,

5  as in Howard, plaintiffs have not come forth with any evidence

6  that the agency investigations included any type of

7  discrimination other than age.  See id. (citation omitted).

8  Thus, because plaintiffs' claims for any type of discrimination

9  other than age "were not within the scope of the [agencies']

10 actual investigation and could not reasonably be expected to grow

11 out of the factual allegations of discrimination contained on the

12 face of [their] respective charges of discrimination[,]" such

13 claims were not administratively exhausted.  See Brooks, 2007 WL

14 1063059, at *4 (citations omitted).  Consequently, this court

15 lacks subject matter jurisdiction over all allegations of

16 discrimination in the complaint which are premised upon

17 violations of Title VII.  See id.   The court must, therefore,

18 grant defendants' motion for summary judgment as to these claims,

19 albeit not for the reasons defendants proffered.  See United

20 Investors Life Ins. Co. V. Waddell & Reed, 360 F.3d 960, 967 (9th

21 Cir. 2004) (citation omitted) ("[T]he district court ha[s] a duty

22 to establish subject matter jurisdiction over the removed action

23 sua sponte, whether the parties raise the issue or not."); see

24 also Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion

25 of the parties or otherwise that the court lacks jurisdiction of

26 the subject matter, the court shall dismiss the action.")  In

27 light of the foregoing, the only remaining federal claims are

28

those based upon alleged violations of the ADEA, which the court will next address.

**B.  *Individual Liability***

Liberally construing this *pro se* complaint, it can be read as asserting claims against defendant Watterson, the High School principal and plaintiffs' immediate supervisor, in both her official and individual capacities.  Defendant Watterson is seeking summary judgment on the basis that as an "individual supervisor[]" she cannot be held liable under that statute.  Mot. (doc. 21) at 12.

Ms. Watterson's position is well taken, and the plaintiffs do not argue to the contrary.  To the extent the plaintiffs are asserting ADEA claims against defendant Watterson in her individual capacity, she is entitled to summary judgment.  See Miller v. Maxwell's Intern. Inc., 991 F.2d 583, 587 (9th Cir. 1993) (no individual liability under the ADEA).  Likewise, because any ADEA claims against defendant Watterson in her official capacity merge with those against her employer, the defendant High School, she is entitled to summary judgment as to those claims as well.  See Daniels v. Chertoff, 2007 WL 1140401, at * 6 (D. Ariz. April 17, 2007) (citations omitted) (dismissing Title VII claim against defendant employees in their official capacities "because it merge[d] with Plaintiff's claims against his employer").  Thus, the only remaining defendants are the institutional defendants.

**C.  *ADEA***

It is difficult to discern from their complaint the exact

- 15 -

1   nature of plaintiffs' ADEA claims. Broadly stated, they appear to

2   be alleging disparate treatment and constructive discharge.

3       The ADEA makes it "unlawful for an employer . . . to fail or

4   refuse to hire or to discharge any individual [who is at least 40

5   years old] or otherwise discriminate against any individual with

6   respect to his compensation, terms, conditions, or privileges of

7   employment because of such individual's age."  29 U.S.C.

8   § 623(a)(1).  In general two theories of liability are available

9   to an ADEA plaintiff: (1) disparate treatment and (2) disparate

10  impact.[4]  Enlow v. Salem-Keizer Yellow Cab Co., Inc., 389 F.3d

11  802, 811 (9th Cir. 2004).  "Disparate treatment is demonstrated

12  when the employer simply treats some people less favorably than

13  others because of their race, color, religion [or other protected

14  characteristics]."  Id. (internal quotation marks and citations

15  omitted).

16      "To establish a violation of ADEA under a disparate treatment

17  theory of liability, [a plaintiff] must first establish a prima

18  facie case of discrimination."  Coleman v. Quaker Oats Co., 232

19  ────────────────────

20      [4]    "'Disparate impact' claims are those where the identified employment
    practices are facially neutral in their treatment of different groups, but 'in
    effect fall more harshly on one group than another and cannot be justified by
21  business necessity.'"  Wagner v. Pacific Maritime Association, 2007 WL 2407093,
    at *4 (D.Or. Aug. 21, 2007) (quoting Int'l Broth. Of Teamsters v. United States,
    431 U.S. 324, 335 n. 10 (1977)).  "The Supreme Court has not clearly addressed
22  whether plaintiffs may bring disparate impact claims under the ADEA[,] but" the
    Ninth Circuit "permits such claims."  Id. (citing, inter alia, Pottenger v.
23  Potlach Corp., 329 F.3d 740, 749 (9th Cir. 2003)).
        Defendants discuss disparate impact in their memorandum.  The court need
24  not address this theory of liability, however, because regardless of how
    liberally it reads plaintiffs' complaint, there are no allegations to support a
25  disparate impact theory of ADEA liability.  As defendants accurately note, the
    complaint does not allege "facially neutral . . . specific practices that are
26  allegedly responsible for [an] adverse impact."  See id. (citing Smith v. City
    of Jackson, 544 U.S. 228, 241 (2005)).  Thus, consistent with the allegations in
27  the complaint, the court will not consider an additional theory of ADEA liability
    based upon disparate impact.

28                          - 16 -

1  F.3d 1271, 1280-81 (9th Cir. 2000) (internal quotation marks and

2  citation omitted).  "A disparate treatment age discrimination

3  claim may be proved by direct, statistical, or circumstantial

4  evidence that gives rise to an inference of age discrimination."

5  Silva v. Chertoff, 2007 WL 1795786, at *5 (D. Ariz. June 20,

6  2007) (citations omitted). "When a plaintiff alleges disparate

7  treatment based on direct evidence in an ADEA claim," there is no

8  need to "apply the burden-shifting analysis set forth in

9  McDonnell Douglas Corp. v. Green, 411 U.S. 792 . . . (1973) in

10 determining whether the evidence is sufficient to defeat a motion

11 for summary judgment.  Enlow, 389 F.3d at 812.  "Direct evidence,

12 in the context of an ADEA claim, is defined as evidence of

13 conduct or statements by persons involved in the decision-making

14 process that may be viewed as *directly reflecting* the alleged

15 discriminatory attitude . . . sufficient to permit the *fact*

16 *finder* to infer that that attitude was more likely than not a

17 motivating factor in the employer's decision."  Id. (internal

18 quotation marks and citations omitted) (emphasis added).

19   Here, despite a lengthy record, plaintiff Oshilaja has not

20 pointed to any direct evidence of conduct or statements by

21 defendant Watterson or others involved in the decision-making

22 process "that may be viewed as directly reflecting" age

23 discrimination against him.  See id.  No mention is made in his

24 supporting affidavit of any such evidence.  Nor has plaintiff

25 Oshilaja shown where in his 295 page deposition such evidence can

26 be found.

27   Plaintiff Indermaur is in a similar, although not identical

28                              - 17 -

1  position.    In her supporting affidavit she avers that an unnamed

2  defendant, presumably Ms. Watterson, "constantly" called her

3  "'Veteran' . . . instead of calling [plaintiff] by [her] name."

4  Doc. 29 (Aff. of Rebecca Indermaur (March 25, 2007)) at 22.

5  Assuming the veracity of this statement, it does not constitute

6  *direct* evidence that the decision to require all teachers to

7  reapply for the 2004-05 academic year was motivated by age,

8  especially when taken in the context of the record as a whole.

9    Given the lack of direct evidence of age discrimination,

10  plaintiffs must resort to the by now familiar three step burden-

11  shifting analysis under McDonnell Douglas, which applies when an

12  ADEA plaintiff is relying on circumstantial evidence of

13  discrimination.    Enlow, 389 F.3d at 812.    The initial burden

14  under that framework is one of production; plaintiff must

15  establish a *prima facie* case here, of an ADEA violation based

16  upon disparate treatment.    See Silva, 2007 WL 1795786, at *5.    "A

17  mere showing that there was disparate treatment is not

18  sufficient; rather [plaintiffs] must show that the alleged

19  disparate treatment was the result of intentional discrimination

20  based upon [their] protected class characteristics."    Id.

21  (citation omitted).

22    Generally, to establish a *prima facie* case, a plaintiff must

23  show that "(1) she belongs to a protected class, (2) she was

24  performing according to her employer's legitimate expectations,

25  (3) she suffered an adverse employment action, and (4) other

26  employees with qualifications similar to her own were treated

27  more favorably."    Godwin v. Hunt Wesson, Inc., 150 F.3d 1217,

28                                   - 18 -

1220 (9ᵗʰ Cir. 1998) (citations omitted).  As will become
apparent, plaintiffs' evidence is sorely lacking with respect to
nearly all of these factors.

### 1.  Protected Class

There is no dispute that the first element of a *prima facie*
case is met here.  Both plaintiffs were, as the ADEA mandates,
"at least 40 years of age" during the relevant time frame.  <u>See</u>
29 U.S.C. § 631(a) (West 1999).  Plaintiff Oshilaja was
approximately 49  years old, and plaintiff Indermaur was 64 years
old.  Doc. 23, exh. 1 thereto at Parts 5 and 7.

### 2.  Performance

Although plaintiffs have easily met the first element,
they have not pointed to any evidence to  support the second
element of a *prima facie* case -- that they were "performing"
their jobs "according to [their] employer's legitimate
expectations[.]" <u>See</u> <u>Godwin</u>, 150 F.3d at 1220 (citations
omitted).  Their complaint alleges that they were "consistently
superior according to previous evaluations." Co. (doc. 6-2) at
9, ¶ 32.  Even if that is the legal applicable standard, which it
is not, this conclusory allegation in the complaint is
insufficient on a motion for summary judgment.  It is
insufficient because plaintiffs are relying upon their pleadings,
rather than "set[ting] forth specific facts showing that there is
a genuine issue for trial." <u>See</u> Fed. R. Civ. P. 56(e).

To be sure, the defendants are not asserting that plaintiffs
were not performing to the defendants' legitimate expectations.
But that is of no consequence because the moving party need not

1   disprove matters, such as this, on which the opponent has the

2   burden at trial.   See Celotex Corp. v. Catrett, 477 U.S. 317,

3   323-24 (1986). Conversely, when the "moving party will have the

4   burden of proof at trial," as will the plaintiffs on this

5   particular issue, their "showing must be sufficient for the court

6   to hold that no reasonable trier of fact could find other than

7   for the moving party."   In re Feature Realty Litigation, 2007 WL

8   2703002, at *4 (E.D. Wash. Sept. 13, 2007) (internal quotation

9   marks and citation omitted). Clearly, plaintiffs' proof in the

10  present case falls far short of that standard.   Thus, because

11  plaintiffs have not made a "showing sufficient to establish the

12  existence of an essential element" of their ADEA disparate

13  treatment claim, an element "on which [they will bear the burden

14  at trial[,]" summary judgment is proper.   See id. at 322.

15          *3.   "Adverse Employment Action"*

16    Because plaintiffs have not met their burden as to one of the

17  four elements of a *prima facie* case, the court could end its

18  analysis here.   For the sake of completeness, however, and giving

19  some deference to plaintiffs' *pro se* status, the court will

20  address the remaining two elements -- adverse employment action

21  and more favorable treatment.

22    Plaintiffs did not specifically articulate the adverse

23  employment action which forms the basis for their ADEA causes of

24  action.   Based upon the complaint, presumably the alleged adverse

25  employment action took three forms.   The first is "involuntary

26  termination" which from plaintiffs' standpoint occurred, in large

27  part, because they were required to reapply for their teaching

28                              - 20 -

1  positions for the 2004-2005 academic year.  <u>See</u> Co. (doc. 6-2) at

2  8, ¶ 26.  According to their complaint, plaintiffs "inferred"

3  from this requirement "that [they] were all fired[.]" <u>Id.</u>

4  Plaintiffs further "inferred" from this requirement that "if

5  . . . rehired, it would be at a lower salary scale."[5]  <u>Id.</u>

6  Second, in the case of plaintiff Oshilaja, the alleged adverse

7  employment action arises from the fact that he was not rehired

8  despite reapplying.[6]  The third alleged adverse employment action

9  is plaintiffs' "reassignment to menial duties[.]" <u>Id.</u> at 7.  For

10 the reasons set forth below, with the possible exception of not

11 rehiring plaintiff Oshilaja, the court finds that none of these

12 allegations support a finding of adverse employment action.

13       ***a.  Re-application Requirement***

14   Generally the Ninth Circuit takes an "expansive view of the

15 types of actions that can be considered adverse employment

16 actions." <u>Ray v. Henderson</u>, 217 F.3d 1234, 1241 (9th Cir. 2000)

17 (citing cases).  That "expansive view" is not without limits

18 however.   The following undisputed facts persuade the court that

19

20        [5]   Plaintiffs make much of the fact that supposedly had they been
   rehired, it would have been at a lower salary.  This assertion is baseless.
21 Plaintiff Oshilaja, as a teacher at the High School for nine years, did have
   concerns about his salary if rehired.  To alleviate those concerns, he contacted
22 the human resources representative who assured him that if rehired, he would be
   "grandfathered[,]" so that he would continue to make the same salar.  Doc. 23,
23 exh. 1 thereto at 221-224.  As plaintiff Oshilaja understood it, defendants had
   "no choice but to pay" him the same salary.  <u>Id.</u> at 224.  Given this concession,
24 plaintiffs' attempt to introduce salary as a basis for an ADEA claim is
   misplaced.

25        [6]   Plaintiff Indermaur readily concedes that she did not reapply.
   Therefore, in contrast to plaintiff Oshilaja, she cannot claim an adverse
26 employment based upon failure to rehire.  <u>See</u> <u>Silva</u>, 2007 WL 1795786, at *9
   (unable to find adverse employment action based upon failure to promote where
27 plaintiff did not apply for promotion)(citing <u>Pejic v. Hughes Helicopter, Inc.</u>
   840 F.13d 67, 673 (9th Cir. 1988)).

28                                    - 21 -

1  requiring  plaintiffs to reapply for their teaching positions for

2  the 2004-2005 academic year did not amount to an adverse

3  employment action so as to support a *prima facie* case of

4  disparate treatment based on age.  First of all, the court must

5  view the re-application requirement in context.  It occurred

6  during a transition period for the High School, when the School

7  was changing.  The decision to require  plaintiffs, as well as

8  all other current teachers, to reapply is consistent with that

9  restructuring.

10    Second, and more significant, as plaintiffs repeatedly

11  acknowledged, is the fact that a*ll* of the teachers had to

12  reapply, regardless of age.  For example, plaintiff Indermaur

13  testified that all teachers were "encouraged . . .  to

14  reapply[.]" Doc. 23, exh. 2 thereto at 244.  Not only that,

15  plaintiffs were employed on a year-to-year contractual basis.  In

16  light of the foregoing, even assuming *arguendo* the existence of

17  the other *prima facie* elements, the court is hard pressed to find

18  that plaintiffs sustained an adverse employment action when they,

19  like all other faculty members, were required to reapply to be

20  considered for a position for the next academic year.

21         ***b.  "Involuntary Termination"***

22    Plaintiffs fare no better with their involuntary termination

23  argument.  Termination is a form of adverse employment action.

24  See Hedenburg v. Aramark American Food Services, Inc., 476

25  F.Supp.2d 1199, 1207 (W.D. Wash. 2007) ("She was terminated and

26  thus suffered an adverse employment action, in satisfaction of

27  the third element.") Here, the uncontroverted facts do not

28                                 - 22 -

support a finding of involuntary termination though.

During her deposition, plaintiff Indermaur was questioned quite closely as to plaintiffs' allegations that they were terminated. Plaintiff Indermaur admitted that she was "never . . . terminated by anybody, . . . from [her] job at the high school[.]" Doc. 23, exh. 2 thereto at 249.  She further admitted that defendant Watterson "did not fire" her or plaintiff Oshilaja.  <u>Id.</u> at 251. Plaintiff Indermaur continued, "She [defendant Watterson] did not willfully terminate us according to our contract.  She did that correctly."  <u>Id.</u>  This testimony is consistent with the nature of plaintiffs' employment contracts; they were annual, for one academic year. Plaintiff Oshilaja similarly testified, acknowledging that he was never informed in writing or verbally that he was terminated.  <u>Id.</u>, exh. 1 thereto at 225.

Further, as noted earlier, plaintiffs are seeking to have this court "infer" that they were involuntarily terminated in light of the re-application requirement.  This argument ignores a fundamental principle of summary judgment.  At this stage, the court "need not draw *all* possible inferences in [plaintiffs'] favor, but only all *reasonable* ones."  <u>Villiarim v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1065 n.10 (9th Cir. 2002) (citation omitted) (emphasis in original).  On this record where, *inter alia*, all teachers were required to reapply regardless of age, involuntary termination is not a reasonable inference; it is an *un*reasonable inference.  Thus, the court finds, as plaintiffs' own testimony demonstrates, that there is no factual basis for a finding of involuntary termination.  In turn, there can be no

1  adverse employment action in this regard.

2      ### c.  Failure to Rehire

3      Failure to rehire, under some circumstances, can constitute an

4  adverse employment action.   See McDonnell Douglas, 411 U.S. at

5  804 (failure to rehire sufficient consideration of adverse

6  employment action).   In the present case, however, because

7  plaintiff Oshilaja is unable to satisfy all four criteria

8  necessary to make out a *prima facie* case of discrimination, this

9  failure to rehire is not sufficient to withstand defendants'

10  summary judgment motion.[7]

11      ### d.  "Assignment to Menial Duties"

12      As noted earlier, plaintiffs allege that they were assigned to

13  "menial duties" consisting of teaching subjects outside of math

14  and science "due to a shortage of staff[.]" Co. (doc. 6-2) at 7,

15  ¶ 23.  Even if this amounts to an "adverse employment action," it

16  cannot be the basis of any ADEA claims herein because during

17  their depositions plaintiffs essentially abandoned this theory.

18  They did so by agreeing that this reassignment was not menial,

19  and further conceding that they did not have to engage in what

20  are undisputably menial (but necessary) tasks, such as scrubbing

21

22          [7]      Moreover, even if plaintiff Oshilaja had established a *prima facie*
23  case in this regard, defendants have met their burden under the by now familiar
   framework of McDonnell Douglas, 411 U.S. 792, of "articulating a legitimate
   nondiscriminatory reason for [their] alleged discriminatory conduct."   See
24  Vasquez v. County of Los Angeles, 349 F.3d 634, 640 (9th Cir. 2003).  In this
   case that reason was plaintiff's low score during the interview process relative
25  to the other candidates.  What is more, plaintiff Oshilaja has not, as is his
   burden at this juncture, shown that defendants' reason for not rehiring him was
26  pretextual.  See id.  Plaintiff Oshilaja could have met that burden in one of two
   ways.  He could have shown "pretext directly, by showing that discrimination more
   likely motivated [defendants], or indirectly, by showing that [defendants']
27  explanation is unworthy of credence."   See id.  He did neither.

28                                    - 24 -

toilets or cleaning scrubbing sinks.  Doc. 23, exh. 1 thereto at
185-86; and exh. 2 thereto at 235-36.  Moreover, plaintiffs'
depositions reveal that they were not singled out for this
reassignment based upon their age or for any other reason.
"[A]ll of the four math/science teacher[s] remaining" were
reassigned in this way.  Id., exh. 1 thereto at 189 and 190; and
exh. 2 thereto at 232-33.  Indeed, as alleged in their complaint,
and as they testified to during their depositions, this
reassignment was necessitated by a staffing shortage.  Id.  Thus,
this supposed assignment to menial duties cannot form the basis
of a finding of adverse employment action necessary to support a
*prima facie* case under the ADEA.

### *4.  More Favorable Treatment*

   Evidence of the fourth element of a *prima facie* case,  that
"employees with qualifications similar to [plaintiffs] were
treated more favorably[,]" is wholly lacking here.  See <u>Godwin</u>,
150 F.3d at 1220.  Plaintiffs refer to one teacher by name,
Amanda Patrie, whom they claim was unqualified and to whom
supposedly "favoritism" was shown.  See Doc. 29 (Aff. Of Shelley
Schauberger (March 16, 2007)) at 7; see also Resp. (doc. 24) at
8, 15 and 19.  Plaintiffs also broadly state, with no cites to
the record, "[i]n 2004 [they] were replaced by two younger white
females."  Resp. (doc. 24) at 12.  These references fall far
short of the proof necessary to show that employees with similar
qualifications to plaintiffs were treated more favorably than
they were.

   Plaintiffs have not shown what their qualifications were, let

alone what they were in comparison to others, such as Ms. Patrie. Moreover, the evidence shows that Ms. Patrie was a language arts teacher, and plaintiffs were both math and science teachers. Doc. 29 (Schauberger Aff.) at 5.  Hence, on this basis alone there can be no finding that Ms. Patrie and plaintiffs had "similar qualifications."  What is more, plaintiffs have not indicated where in the record it shows Ms. Patrie's age. "Younger" and "older"[8] are relative terms.  Assuming Ms. Patrie and plaintiffs were similarly qualified, plaintiffs have not pointed to any concrete evidence of  Ms. Patrie's age.  Another critical weakness in this proof is that despite what plaintiffs would like this court to infer, Ms. Patrie was not hired as their replacement.  She was hired while both plaintiffs were still employed at the High School.  See id.  Thus, as with the second element of a *prima facie*, plaintiffs also have not met their burden on this fourth element.

     The court is keenly aware that "on summary judgment, [t]he requisite degree of proof necessary to establish a prima facie case . . . is minimal and does not even need to rise to the level of a preponderance of the evidence[.]" Metoyer v. Chassman, 2007 WL 2781909, at *7 (9th Cir. 2007) (internal quotation marks and citation omitted); see also Nidds, 113 F.3d at 917 (citations omitted) ("[V]ery little" evidence "is required[] in order to show a *prima facie* case of discrimination.") A summary of

---

     [8]      This is how plaintiffs frequently describe themselves and "other senior staff that had been with [the] high school before the defendant [Watterson] became principal." Co. (doc. 6-2) at 3-11.

1  plaintiffs' evidence herein quickly shows, however, that they

2  have not met even this minimal threshold of proof.  The only

3  element which clearly they have met is the first; plaintiffs are

4  within the protected class under the ADEA.  There is a complete

5  absence of proof as to the second element, their job performance.

6  Likewise, there is no proof as to the fourth element, that

7  employees with similar qualifications to plaintiffs were treated

8  more favorably.  Finally, of the three types of alleged adverse

9  employment action, only one is arguably supported by this record

10 and that is the fact that defendants did not rehire plaintiff

11 Oshilaja. Of course, without proof of each of the other three

12 elements of a *prima facie* case, that failure to rehire does not

13 allow Mr. Oshilaja to survive defendants' summary judgment

14 motion.  In short, at nearly every step of the *prima facie*

15 analysis, plaintiff' evidence is legally insufficient for one

16 reason or another.  Accordingly, because plaintiffs have failed

17 to meet their initial burden of establishing a *prima facie* case

18 of discrimination, their cross-motion for summary judgment as to

19 the ADEA disparate treatment claims is denied, and defendants'

20 motion for summary judgment is granted.[9]

21  ***B.  Constructive Discharge***

22    As previously noted, plaintiffs specifically allege in

23 their complaint constructive discharge in violation of the ADEA.

24 Plaintiffs misconceive the nature of a constructive discharge

25 claim however.  The underlying factual predicate for such a claim

26  _____

27      [9]      This holding obviates the need for the court to proceed to the next
   step of the McDonnell Douglas burden shifting analysis.

28                                - 27 -

1  is an employee's decision to resign.  See Poland v. Chertoff, 494

2  F.3d 1144, 1184 (9th Cir. 2007) (quoting Penn. State Police v.

3  Suders, 524 U.S. 129, 141 (2004))(emphasis added) ("'Under the

4  constructive discharge doctrine, an employee's reasonable

5  *decision to resign* because of unendurable working conditions is

6  assimilated to a formal discharge for remedial purposes.  The

7  inquiry is objective: Did working conditions become so

8  intolerable that a reasonable person in the employee's position

9  would have felt *compelled to resign*?'"); see also Hardage v. CBS

10 Broad., Inc., 427 F.3d 1177, 1184 (9th Cir. 2005) (emphasis

11 added), as amended by, 433 F.3d 672 (9th Cir. 2006), 436 F.3d 1050

12 ("[T]o survive summary judgment on a constructive discharge

13 claim, a plaintiff must show there are triable issues of fact as

14 to whether a reasonable person in [his] position would have felt

15 that [he] was *forced to quit* because of intolerable and

16 discriminatory working conditions.") In fact, in Poland, one of

17 the reasons the Ninth Circuit gave for reversing the district

18 court's finding of constructive discharge was the fact that

19 plaintiff "never testified that he felt compelled or forced to

20 resign[.]" Poland, 494 F.3d at 1186.  "Instead, [plaintiff]

21 testified that he decided to take early retirement[.]" Id.

22   Likewise, that factual predicate is missing here.  There is no

23 evidence that either plaintiff resigned or was forced to quit.

24 Rather, plaintiffs' employment ended when their annual contracts

25 did, in May, 2004.  When explaining the circumstances under which

26 she left her employment with the High School, plaintiff Indermaur

27 frankly explained that her "contract came to an end[.]" Doc. 23,

28

exh. 2 thereto at 66.   Even an extremely generous interpretation
of the constructive discharge doctrine does not, as plaintiffs
suggest, encompass a situation such as this where they were
required to reapply for a job after the expiration of their
annual contracts.

  The Ninth Circuit recently stated, albeit in a slightly
different context, that it "set[s] the bar high for a claim of
constructive discharge[.]" <u>Poland</u>, 494 F.3d at 1184.   The
underlying rationale for that is that "federal antidiscrimination
policies are better served within their existing employment
relationship, rather  than when the employee walks away and then
later litigates whether his employment situation was
intolerable." <u>Id.</u> (footnote and citations omitted).   In any
event, returning to the applicable summary judgment standard,
viewing the evidence in the light most favorable to plaintiffs,
based on this record the court "cannot see how a reasonable trier
of fact could find that [plaintiffs] w[ere] "driven from the
workplace[]" so as to support a claim for constructive discharge.
<u>See</u> <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 930 (9th Cir.
2000).   Thus, as with their disparate treatment claims, because
plaintiffs did not meet their burden of proof, the court must
deny their cross-motion for summary judgment as to this ADEA
claim as well.   On the other hand, defendants's summary judgment
motion on this claim is granted.

. . .

1 ***V. Supplemental State Law Claims*[10]***

2   For the reasons discussed above, defendants are entitled to

3 summary judgment with respect to plaintiffs' federal law based

4 causes of action.  The court therefore declines to exercise

5 supplemental jurisdiction over plaintiff's remaining state law

6 claims for defamation and for violation of A.R.S. § 38-531,

7 Arizona's "Whistle blower" Act.  See 28 U.S.C. § 1367(c)(3); see

8 also Acri v. Varian Associates, Inc., 114 F.3d 999, 1001 (9th Cir.

9 1997)(quoting Carnegie-Mellon Univ. V. Cohill, 484 U.S. 343, 350

10 n. 7 (1988)) ("The Supreme Court has stated and we have often

11 repeated that 'in the usual case in which all federal law claims

12 are eliminated before trial, the balance of factors . . . will

13 point toward declining to exercise jurisdiction over the

14 remaining state-law claims.'")

15                           ***Conclusion***

16   For the reasons set forth herein, IT IS ORDERED that:

17   (1) defendants' motion for summary judgment (doc. 21) is

18 GRANTED; and

19   (2) plaintiffs' cross-motion for summary judgment (docs. 24 and

20 25) is DENIED.

21   The Clerk of the Court is directed to enter judgment in favor

22 of defendants Ms. Yvonne Watterson, Gateway Community High

23

24         [10]    After a discussion of the merits, almost as an afterthought the
25 institutional defendants assert, without any support or argument, that they "are
   [not] jural entities capable of being sued."  Mot. (Doc. 21) at 13 (citation
26 omitted).  There is no way to discern whether defendants are asserting Eleventh
   Amendment immunity, or whether they are making some other related argument.  The
27 court declines to speculate as to this nature of this argument which was not
   briefed at all.

28                              - 30 -

1  School, Gateway Community College, and the Maricopa County
2  Community College District; and to terminate this action.
3     DATED this 30th day of September, 2007.
4
5
6  _____
   Robert C. Broomfield
7     Senior United States District Judge
8
9
10
11  Copies to plaintiffs *pro se* and counsel of record
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
                          - 31 -